863 A.2d 409 (2005)
374 N.J. Super. 68
Gregory F. SULLIVAN, M.D., and Gregory F. Sullivan, P.A., Plaintiffs-Appellants,
v.
Peter ASLANIDES; Stephen M. Vajtay, Jr.,; and McCarter & English, LLP, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2004.
Decided January 6, 2005.
George J. Kenny, Roseland, argued the cause for appellants (Connell Foley, attorneys; Mr. Kenny, of counsel and on the brief).
Laurence B. Orloff, Roseland, argued the cause for respondents (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Mr. Orloff, of counsel and on the brief; Craig A. Ollenschleger, on the brief).
Before Judges WEFING, PAYNE and C.S. FISHER.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Plaintiff has appealed from trial court orders granting summary judgment to defendants on the ground that the complaint was barred by the statute of limitations and imposing sanctions for a discovery violation.[1] *410 After reviewing the record in light of the contentions advanced on appeal, we reverse the grant of summary judgment and affirm the imposition of sanctions.

I.
Plaintiff Sullivan is a cardiologist who maintained his office in Rutherford. He opened his office in 1974 and practiced by himself for a number of years. In 1988 he decided to hire an associate physician to assist him in the practice. To that end, he retained defendant Peter Aslanides, Esq., a partner in the law firm of McCarter & English, to draft an employment agreement, which was, in addition to its other terms, to set forth the performance requirements for the associate physician to become a shareholder in the firm. Aslanides and defendant Stephen M. Vajtay, Jr., Esq., another attorney at the firm, prepared such an agreement.
Plaintiff hired Stanley A. Szwed, M.D., as an associate physician, and in July 1988 the two men executed the employment agreement defendants had prepared. The agreement included the following language in paragraph 7(e):
Upon the Employee's acquisition of the interest [i.e., becoming a shareholder], the base salary of the Employee and Dr. Gregory Sullivan shall be $250,000 per annum. Additionally, after all expenses of the Practice are paid, each such party shall be entitled to a bonus which shall equal the portion of the Practice's excess profits for the year proportional to each doctor's proportionate share of total billings.
Szwed met all of the performance objectives contained in this agreement and in 1992 became a 49% shareholder in the professional corporation. In September 1992 Sullivan and Szwed executed a Memo of Understanding, which stated in part, "`Core' expenses regarding the Garfield/Rutherford offices will be shared."[2] Defendants were not involved in the preparation of this Memo of Understanding.
In 1994 Szwed withdrew as a shareholder, and in November 1994 he filed suit, alleging that he was due additional monies. Szwed included among his allegations that he had been charged a disproportionate share of the expenses of the practice and thus had received less in distribution than he should have.
During the time that Sullivan and Szwed practiced together, Sullivan's wife, Gene Sullivan, served as the firm's bookkeeper and treasurer, and she computed the compensation due to both men. During the course of the litigation, she explained the methodology she employed. She would attribute a portion of the total gross revenues of the practice to each doctor in accordance with their respective proportionate share of the business. From that proportionate share of gross revenue, she would deduct the doctor's salary and one-half of all of the expenses of the practice and treat the balance remaining as that doctor's respective share of the excess profits. She testified that she understood both the employment agreement and the Memo of Understanding to call for Sullivan and Szwed to share equally in the expenses of the practice.
During the course of the trial, Szwed presented an accounting expert who testified that Szwed did not receive his correct share of the profits of the practice. This expert testified about several different *411 methods of calculating compensation, but he did not testify that a particular one was correct. For example, he prepared calculations that allocated expenses based upon stock ownership as well as calculations allocating expenses based upon Gene Sullivan's patient attribution and Szwed's patient attribution. The trial judge rejected his testimony as confusing and unpersuasive. Judgment was entered, finding that Sullivan had prevailed upon all claims except for $8,828.82 conceded to be due to Szwed. The judgment also awarded Sullivan, in accordance with the employment agreement, $119,500.62 for counsel fees and expenses.
Szwed appealed, and this court reversed, finding that the methodology employed by Gene Sullivan to compute distributive profits was clearly not in accord with 7(e) of the employment agreement. Szwed v. Sullivan, No. A-2859-98 (App.Div. March 17, 2000) (slip op. at 4). In the course of our opinion, we stated:
The methodology prescribed by paragraph 7(e) for determining the remuneration of each stockholder-partner is clear and unequivocal. As that paragraph unambiguously requires, the total gross revenue of the Practice as a whole, that is the aggregate billings of both physicians, must be first ascertained. From that aggregate total, all of the expenses of the Practice, including the $250,000 salary of each physician, must be deducted. The balance remaining after the deduction of total expenses constitutes the "excess profits" referred to by paragraph 7(e). It is to that net sum that the proportionate share of total billings of each doctor  however that proportionate share of billings is ascertained  is to be applied in order to arrive at the remuneration of each.
We noted that the result of Mrs. Sullivan's computation was to charge Dr. Szwed with 50% of the expenses of the practice while only crediting him with only 31% of the billings which, in our view, could not have been the intent of 7(e). We remanded the matter back to the Chancery Division for trial.
Prior to retrial, the parties reached a settlement that they placed upon the record on June 11, 2001. The terms of that settlement called for Dr. Sullivan to pay to Dr. Szwed $600,000, $300,000 of which was allocated to the repurchase of Dr. Szwed's shares in the professional corporation and the balance to his claim of underpayment.
On July 23, 2001, approximately six weeks after that settlement was placed on the record, plaintiff filed the instant complaint, in which he alleged that defendants were negligent in their preparation of the employment agreement. Plaintiff alleged in this complaint that he had instructed defendants that the employment agreement should provide that core expenses of the practice would be divided equally between the shareholders. He maintained that his settlement payment of $600,000 was the result of defendants' failure to draft the employment agreement in the manner he had instructed. After an extensive period of discovery, defendants moved for summary judgment, arguing that the complaint was filed beyond the applicable period of limitations. The trial court agreed and granted defendants' motion for summary judgment.

II.
A claim of legal malpractice is subject to a six-year period of limitations. McGrogan v. Till, 167 N.J. 414, 419, 771 A.2d 1187 (2001) (noting "[f]or more than twenty-five years, an uncontested principle of New Jersey's decisional law has been that the six-year statute of limitations of *412 N.J.S.A. 2A:14-1 applies to legal malpractice actions"). Plaintiff's malpractice complaint having been filed on July 23, 2001, the critical date for purposes of limitations analysis is July 23, 1995. The trial court here concluded that plaintiff knew, prior to July 23, 1995, that the employment agreement had not been drafted in accordance with the instructions he said he gave to defendants. Knowledge by itself, however, is insufficient to trigger the running of the statute of limitations; a party must also have incurred damages. Grunwald v. Bronkesh, 131 N.J. 483, 492, 621 A.2d 459 (1993). The damages, moreover, must be actual damages, that is, "real and substantial as opposed to speculative." Id. at 495, 621 A.2d 459.
The trial court also concluded that plaintiff suffered actual damages no later than November 17, 1994, the date upon which he retained counsel to defend him in the Szwed litigation. In support of this conclusion, the trial court relied upon Grunwald, supra, and Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151 (3rd Cir.2001). We consider these cases distinguishable and disagree with the trial court's determination as to when Sullivan suffered actual damages.
Plaintiff in Grunwald retained defendant Bronkesh to prepare an option agreement with regard to the sale of certain property in Atlantic City to Resorts International Hotel and Casino, Inc. Grunwald, supra, 131 N.J. at 488, 621 A.2d 459. Bronkesh did so and submitted the option, together with a form of contract annexed, to Resorts. Ibid. Resorts signed both the option and the contract and Bronkesh then advised Grunwald he had an enforceable contract for the sale of the property. Ibid. Based upon that advice, Grunwald did not pursue another opportunity to sell the property but Resorts never exercised the option. Ibid. In 1984 Grunwald sued Resorts for specific performance, but was unsuccessful. Ibid. He also lost on appeal when this court, in November 1985, affirmed the trial court's order. Ibid. Five years after that affirmance, in September 1990, Grunwald sued Bronkesh, saying Bronkesh had committed malpractice in advising him that Resorts had exercised the option by executing the sales contract attached to the option agreement. Ibid. The trial court held Grunwald's malpractice action barred by the statute of limitations. It found the statute began to run in July 1984 when the trial court denied Grunwald specific performance against Resorts. Id. at 489, 621 A.2d 459. On appeal, this court reversed, finding that the statute did not begin to run until November 1985, when the decision of the trial court was affirmed. We reasoned that until that point, Grunwald's damages were only speculative. The Supreme Court, however, reversed this court and reinstated the judgment of the trial court dismissing the malpractice action for having been filed beyond the six-year limitations period. Id. at 500, 621 A.2d 459.
The main focus of the Court in Grunwald was its determination that the discovery rule should be applied to legal malpractice actions. Id. at 492-95, 621 A.2d 459. The elements of the discovery rule, of course, are injury or damages and fault. Id. at 495, 621 A.2d 459. In finding Grunwald's action time-barred, the Court ruled that his cause of action for malpractice accrued at the time of the trial court's ruling adverse to his position. Id. at 500, 621 A.2d 459. In the course of its discussion of the necessity of having incurred actual damages for limitations purposes, the Court noted that payment of attorney's fees can constitute such damages. Id. at 495, 621 A.2d 459.
In Dixon, the court was presented with separate, but related claims of legal malpractice. *413 Plaintiff Dixon owned industrial property in Jersey City that it contracted to sell in 1983. Attorney O'Connor represented Dixon in connection with the negotiations, contract preparation and closing. Dixon, supra, 248 F.3d at 156. The contract called for a closing within sixty days of the purchaser having obtained a variance, which occurred on October 12, 1983. Ibid. The closing, however, did not take place until February 24, 1984. Id. at 157. After the contract had been executed, the New Jersey Legislature enacted the Environmental Cleanup and Responsibility Act ("ECRA") N.J.S.A. 13:1K-6 to -14, to be effective for transfers of real property after December 31, 1983. The result of the delay in closing was to make the transfer of this industrial site subject to ECRA, thus entailing significant costs which had not been anticipated. O'Connor had not advised Dixon of the potential ramifications of not closing on this transaction prior to December 31, 1983.
Dixon was, at the same time, selling additional property in Jersey City and retained attorney Friedman to represent it in connection with that sale, which occurred after December 31, 1983, and was subject to ECRA. In the course of handling that transaction, Friedman advised Dixon that the earlier sale had also triggered ECRA. Id. at 157.
Eventually, litigation commenced to apportion the costs of cleaning up the industrial site and Friedman also assisted Dixon in that matter. Dixon originally prevailed in the trial court in that law suit but was unsuccessful on appeal. Id. at 158. Following that appellate decision in 1989, Friedman had several conversations with representatives of Dixon about the possibility of instituting a legal malpractice action against O'Connor. Ibid. He never did so, however.
Thereafter, in 1996, Dixon filed suit against both O'Connor and Friedman. Dixon, supra, 248 F.3d at 160. It alleged that O'Connor had committed malpractice in not advising Dixon of the ECRA implications of the closing date and that Friedman had committed malpractice in not instituting suit against O'Connor. Id. at 154. The trial court dismissed the claims against O'Connor and his firm as time-barred, a conclusion the Court of Appeals affirmed.[3]
Because this was a diversity case, the court applied New Jersey law in resolving the question when Dixon's cause of action against O'Connor accrued and when it was barred. Id. at 160-61. To do so, it relied upon the Supreme Court's opinion in Grunwald, supra, to analyze when Dixon first had reason to believe O'Connor had been negligent, when it was first harmed by that negligence and when it had reason to believe that his negligence, if any, had caused that harm. Id. at 162. The court concluded that Dixon first had reason to believe that negligence had occurred in connection with the sale of its industrial property when Friedman advised it, in either late 1984 or early 1985, that the sale had been subject to ECRA. Ibid. It also concluded that by October 21, 1985, Dixon had been harmed by that alleged negligence and had reason to link O'Connor to the harm, for it was on that date that it paid Friedman to represent it in connection with the ECRA-related cleanup litigation that had been instituted. Id. at 163.
The trial court here relied upon the references in Grunwald, supra, and Dixon, supra, to payment of legal fees to *414 support its conclusion that Sullivan's retention of counsel to defend against Szwed's lawsuit commenced the period of limitations. We disagree, however, for several reasons.
We do not think either Grunwald or Dixon stand for the proposition that when an individual hires an attorney as a result of actions by another attorney, the statute of limitations begins to run on a malpractice action against the original attorney. Indeed, in Dixon, the court rejected such a bright line rule, saying that it recognized that "not every claim made against a client  and not every counsel fee expended in defense of that claim  triggers the running of the statute of limitations for a legal malpractice claim." Dixon, supra, 248 F.3d at 164. The Court in Grunwald, moreover, did not hold that plaintiff's cause of action accrued when he incurred counsel fees to commence suit to seek specific performance but when he received an adverse decision. Here, Sullivan did not receive an adverse decision until 2000, when we reversed the trial court.
Within its written opinion, the trial court also referred to Palisades Nat'l Bank v. Williams, 816 P.2d 961 (Colo.Ct.App.1991). In that matter, defendant Williams drafted an agreement in 1979 for plaintiff bank with regard to the bank's purchase of certain real property. Palisades, 816 P.2d at 962. The bank learned in 1986 that its contract did not require the seller to participate in the development of an adjoining parcel, although it required the bank to do so, and that the seller intended to enforce the agreement as written. The bank's suit for legal malpractice, filed in 1989, was dismissed as untimely under Colorado's two-year period of limitations. Ibid.
In its opinion, the Colorado Court of Appeals held that the undisputed facts clearly showed that by November 1986 the bank knew that its attorney had incorrectly drafted a contract to the bank's disadvantage. Id. at 963. As we have indicated earlier in this opinion, however, we do not consider the instant situation so clear cut and, thus, we do not view Palisades as persuasive authority.
Further, we are troubled by the potential consequences of the trial court's holding. Parties can commence litigation for a variety of reasons, some substantive, some not. That one party incurs legal expenses in defending against an action does not necessarily equate with fault on the part of the attorney who drafted the document sued upon.
In addition, we think certain of the language in Grunwald has to be read now in light of the Court's later opinion in Olds v. Donnelly, 150 N.J. 424, 696 A.2d 633 (1997). Although the Court in Olds was dealing with the accrual of a claim of legal malpractice in the context of the entire controversy doctrine, it has recognized that the questions of such accrual and entire controversy involve a similar analysis. Olds, supra, 150 N.J. at 436, 696 A.2d 633.
Plaintiff Olds had retained defendant Donnelly to represent him in a medical malpractice action. Id. at 428, 696 A.2d 633. Donnelly never achieved service upon the defendant physician. Ibid. Olds later retained new counsel who eventually achieved service some two years after the complaint was filed; that complaint, however, was dismissed for failure to make timely service, and Olds then sued Donnelly for legal malpractice. Id. at 429, 696 A.2d 633. Donnelly contended the claim against him was barred by the entire controversy doctrine, saying Olds should have joined him as a defendant in the medical malpractice action. Id. at 430, 696 A.2d 633. The Supreme Court affirmed our holding that Olds's legal malpractice action against Donnelly did not accrue until the *415 dismissal with prejudice of his underlying medical malpractice action. Id. at 428, 696 A.2d 633.
It strikes us as incongruous to hold in this case that Sullivan's claim of legal malpractice against defendants accrued when he hired counsel to defend against the Szwed litigation in light of the fact that he prevailed on all issues before the trial court. The trial court in this matter stressed language in our earlier decision in Szwed v. Sullivan which described 7(e) of the employment agreement as "clear and unequivocal" as to how expenses should be allocated. We do not retreat from our earlier decision but note that Szwed's expert never contended that 7(e) mandated the method we directed, and the trial court in that matter did not read 7(e) to compel the computational method we directed.
In our view, the position that the statute of limitations began to run against Sullivan on his claim of legal malpractice on the part of defendants when he retained counsel to defend against Szwed's lawsuit is further weakened by Section 14 of the employment agreement.

Expenses of Enforcement of Covenants. In the event that any action, suit or proceeding at law or in equity is brought by either party to this Agreement to enforce the covenants contained in this Agreement or to obtain money damages for the breach thereof, the successful party shall be entitled, upon demand, to reimbursement from the losing party for all and any expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.
Indeed, because Sullivan prevailed at the trial court level, the judgment that was entered included reimbursement for all of his counsel fees. Clearly, by that point, he had suffered no damages.
Within the course of its opinion, the trial court also discussed the expert report and testimony proffered by Sullivan in the Szwed lawsuit. The trial court expressed the view that this was sufficient to put Sullivan on notice that defendants may have been negligent in drafting 7(e). In light of the characterization by the Chancery Division judge of the expert's report and testimony as confusing and unpersuasive, we decline to adopt such a finding.
We note, for the sake of completeness, that defendants also contend they were entitled to summary judgment because any alleged negligence on their part could not have been a proximate cause of any loss by Sullivan. The trial court declined to rule on this argument and, accordingly, so do we.

III.
We turn now to the claim that the trial court erred in imposing sanctions on Sullivan's attorney for discovery violations. We do not consider it necessary to burden this opinion with the details of the history of the discovery process in this litigation. We deem it sufficient to note that we have reviewed the record with care and are satisfied that the trial court did not abuse its discretion in entering the order of August 1, 2003, making plaintiff responsible to reimburse defendants for the reasonable fees and expenses of their counsel and expert in responding to plaintiff's late expert report nor in entering the order of November 24, 2003, which refused to vacate the earlier provision and ordered plaintiff to pay $24,416.13 to defendants within three weeks. Anything further is unnecessary in our view because it would have no precedential value. R. 2:11-3(e)(1)(E).
The orders under review are affirmed in part and reversed in part, and the matter *416 is remanded for further proceedings consistent with this opinion.
NOTES
[1] We shall, through the course of this opinion, refer to plaintiff in the singular, plaintiff Gregory F. Sullivan, M.D. being the principal of plaintiff Gregory F. Sullivan, P.A.
[2] The practice had expanded its geographic area in the interim.
[3] The trial court also dismissed the malpractice claims against Friedman, a conclusion the Court of Appeals reversed. That aspect of the matter, however, is not relevant to the question presented to us.